Edmonds, J.
The question is presented in this case, simply and nakedly; whether a voluntary assignment by a debtor in failing circumstances is void -by reason of its containing a clause authorizing the assignee to sell the assigned property on credit.
I should be inclined to consider the decision of the supreme court in Burdick v. Hunting (MS.), and the ruling of this court in Barney v. Griffen (2 Comst., 371), as decisive of the question. I have no means of going behind the report of these cases, to inquire into the private opinion of the members of the court, and if I had, I should be reluctant to do so, lest I might be regarded as sanctioning a course that may tend to unsettle and weaken the authority of the court of last resort. So far as the record of the case, made by the authorized officers of the state, may, in its language give rise to doubts or criticism, it becomes a perfectly legitimate subject of inquiry. But when that record is sufficiently explicit on its face, I cannot feel myself at liberty to impair its just force, by any private cross-examination of the members of the court, or b y any private and irresponsible statement of theirs in conflict with the plain import of their official language.
As, however, the authority of the decision of this court has been questioned by the inferior tribunal, whose judg. *592 meat we are now considering, and has been fully discussed on the argument before us, it will be as well to reiterate here, and on this occasion,‘and if practicable, in language too explicit for doubt, our entire concurrence with the ruling on this point, in both of the cases referred to.
For more than thirty years our courts have been struggling to keep within due bounds, voluntary assignments by failing debtors. No one can be engaged long in the administration of justice, without becoming sensible how much fraud and mischief are perpetrated under color of such machinery. To punish a vigilant creditor, to extort terms from him, to keep the property within the debtor’s control by means of a friendly assignee; or to make it as available to him as possible, are far more frequently the purposes of such assignments than a fair and equal distribution of the property among those to whom it equitably belongs. And the result at which courts are bound to aim, such distribution, namely, and-that as soon as practicable, is almost invariably thwarted by these assignments and the delay and hindrance which they interpose, under the pretence of equality and a full dedication of the debtor’s effects to the payment of his debts. Under the name of that equality which is equity, the means of the debtor are placed beyond the reach of his creditors, and frequently consumed in expenses and charges bv the assignee rather than in the liquidation of debts. Such is most generally the practical effect of tolerating these voluntary assignments, and no one can long occupy a seat on the bench without witnessing and lamenting it.
The only ground on which they have ever been allowed at all, is, that they do only that which every principle of honesty demands, and surrender all of the debtor’s property to the satisfaction of all his debts. Yet it most frequently is true, that they operate to withdraw that property from that legitimate purpose, at least for a while, if not permanently, and often appropriate it to other purposes.
*593 The courts have been compelled to witness these frauds, thus perpetrated in the name of the law, until they have been constrained by a sense of duty, to aim at suppressing the evil as far as in them lies, and at attaining that equality which is shunned under the pretence of seeking it.
From the cases of Murray v. Riggs (2 J. Ch. R., 565), and Hyslop v. Clark (14 J. R., 458), both in 1817, until this day, our courts, both of law and equity, have struggled for the attainment of this object and have been engaged in striking down the various forms, devised by the ingenuity of debtors, to pervert a rule, sounding fairly, to purposes of evil.
I remember, well, the effort that was made in the court for the correction of errors, in the case of Grover v. Wakeman (11 Wend.), to relax the strict rule of the courts and sustain these voluntary assignments as a quasi necessary substitute for a bankrupt law. • I was myself engaged in that effort, and was unwilling to extend the rule any further than it had been extended in the case of Murray v. Riggs. But after-full and mature consideration, I was overruled by a very decided majority of the court, and the ruling of Grover v. Wakeman, has ever since, for now some twenty years, been the unwavering law of this state.
The principle established by that case, was happily and forcibly stated by Judge Sutherland, who delivered the prevailing opinion of the court in Grover v. Wakeman, and it ís manifest from the report of the latter case, that it was the intention of that, the court of last resort, after full consideration, so to establish it. “It is time,’’ he says, “that some plain, simple but comprehensive principle should be adopted and settled upon this subject. In the absence of a bankrupt law the right of giving preferences must probably be sustained. Let the- embarrassed debtor, therefore, assign his property for the benefit of whom he pleases; but let the assignment be absolute and unconditional; let it contain no reservations or conditions for the benefit of the assignor; *594 let it not extort from the fears and apprehensions of the creditors, or any of them, an absolute discharge of their debts as the consideration for a partial dividend; let it not convert the debtor into a dispenser of alms to his own creditor, and above all, let it not put up his favor and bounty at auction under the cover of a trust to be bestowed upon the _ highest bidder. After the maturest reflection upon this subject, I have come to the conclusion that the interests, both of debtor and creditor, as well as the general purposes of justice, would be promoted, if the question is still an open one, by confining these assignments to the simple and direct appropriation of the property of the debtor to the payment of his debts. The remnants of many of these insolvent estates are now’ wasted in litigation, growing out of the complex or suspicious character of the provisions of these assignments. One device after another to cover up the property for the benefit of the assignor, or to secure to him, either directly or indirectly, some unconscientious advantage, has from time to time been brought before our courts and received condemnation. But new shifts and devices are still resorted to, and will continue to be so, until some principle is adopted upon the subject, so plain and simple that honest debtors cannot mistake it, and fraudulent ones will be deterred from its violation by the certainty of detection and defeat. The principle to which I have adverted, it appears to me, if adopted, will, to a very considerable extent, accomplish that object.”
I acknowledge the binding force of this decision even in this, the court of last resort, and have ever felt myself constrained to obey it, when sitting in any inferior tribunal. And it is, perhaps, proper that I should admit that subsequent reflection and experience have tended to impress on my mind the conviction of its entire propriety. I am, therefore, disposed to reaffirm it, in the broad and explicit language in which it was then announced. I have already had occasion to do so at the special term of the supreme court, *595 upon the same question now presented to us, and I am now persuaded that there. is no other rule that can he safely adopted, to prevent the innumerable frauds that are perpetrated under the sanction and in the name of these voluntary assignments.
The great consideration that is urged in support of the clause which is objected to in this assignment is, that the assignee must have some discretion as to the mode of selling the property, and that discretion may often warrant a sale on credit; that sales on credit are often expressly sanctioned by the statute, and that, therefore, it cannot be improper to confer in terms upon the assignee the'power which flows to him as a necessary incident of his position, or in the language used in this regard, “ if the law says that the authority, as necessary and beneficial, is given by implication, we shall not commit the absurdity of saying that it is illegal and fraudulent when given in terms.”
Now, it seems to me, that this argument overlooks this important consideration, that sanctioning this clause, “when given in terms,” strips the creditor of his control over the property and confers that control on the debtor.
When a debtor becomes insolvent, his property belongs in equity and justice to his creditors and not to him, and thenceforth, the object and aim of the law is, to give it to his creditors. He has an interest to see that it is not sacrificed or wasted, but is so managed as to pay as much of his debts as possible. This is the extent of his equitable interest, but it is subordinate to the rights of his creditors, which are to have the property applied to the satisfaction of the debts without fraud, hindrance or delay.
That subordination is an inflexible principle of the law, and is universal, save only where it is interfered with by the rule, which sustains these voluntary assignments. It is in obedience to that principle that the creditor has a right1 to resort to the courts, and to enforce the satisfaction of his claim even at the expense of a forced sale and sacrifice of the debtor’s *596 property. It is that which lies at the foundation of all bankrupt laws, and is interwoven into our insolvent laws. It is founded in-justice, enacted into our statutes, and is necessary for the due protection of the immense mass of mercantile transactions which are accumulating around us. Yet it is invaded by the rule which sanctions voluntary assignments, a rule having its origin not in the statute, but in the decisions of our courts, and springing from the difficulties flowing from the absence of a general bankrupt law. A bankrupt law, that would take from the debtor the control of his property when he became insolvent, and transfer it to his creditors, and to them all, and not to such one only as would press the hardest, would obviate all the difficulty. But in the absence of such a law, there is nothing to stay the progress of the vigilant creditor, but a voluntary assignment. How far that assignment shall go, and what shall be its provisions, and what its office, beyond the invasion of the subordination already spoken of, has been the dispute. It is already too well settled for us now to shake, that it may also perform the office of preferring one creditor to another. Shall it go further ? Shall it also give the debtor power to say to his creditor, you shall wait my pleasure for your pay ? You shall abide my time and not select your own for the satisfaction of your just claim? Because, if it may, it necessarily takes from the creditor the control of the mode and manner in which he shall coerce payment, and confers it upon the debtor and the friendly assignee whom he may choose. And can any one say that this is not hindering and delaying creditors? Practically it is so, reason or refine upon it as we may. Anything that interrupts the creditor in the lawful pursuit of his remedy through the courts, for the purpose of enforcing payment, hinders and delays him.
It may be said, however, that this strikes at the principle of voluntary assignments at all, and especially at that which allows of preferences among creditors. Truly, it does seem so; yet those two principles, whether they are exceptions or *597 qualifications to the general rule, are far too well settled for me now to intend to disturb them. The general rule is referred to, for the purpose of avowing the determination at once, of adhering to it and allowing no further exceptions or qualifications to it.
It is not difficult to see how the creditor may be delayed and hindered by the clause in question. When he has obtained his judgment, he has a right to his execution at once and to a sale of the debtor’s property, within such time as the law allows. But the assignment takes away from him that right and compels him to wait such time as the assignee may see fit, subject only to such control as the court may exercise over an unreasonable delay. If it be lawful to insert such a clause, then it will be lawful for the assignee to give a credit, and the only control the creditor can exercise through the courts will be over an unreasonable delay, while without the clause he may ask the courts to order a sale without any delay. In one case, the delay will be in the exercise of a sound discretion, with which the courts will not, for a slight cause, interfere. In the other, it will be an arbitrary act and readily controlled. In one case to give credit, and thereby cause delay, will be a part of his duty, written down for him, and in the other, it will not be-allowed without permission obtained. In one case, it will be at his option, and in the other only by direction of the court after notice to the parties in interest. In one case, he may consult the interest of the debtor who has selected him, and in the other, he must consult that of the creditor, whose trustee he is.
It will not be difficult then to see how the rights and remedies of the creditor may be in fact affected by legalizing this obnoxious clause; and practically we know, and have often seen, how it may be, and has been, used as a means to that end.
The suggestion that credit on official sales is sometimes authorized by statute does not strike me as having any ap *598 plication to the case in hand, for it seems to me there is some difference whether an act is authorized by statute or not. And if the fact that a principle is adopted in a particular statute is a ground for its universal application, .and that seems to be the argument, then the provision of the insolvent laws, forbidding preferences, would destroy all assignments of that character.
But it is unnecessary to dwell upon the other suggestions that were made on the argument. 1 have already stated the general principle on which I regard this clause as illegal, and that is in no wise affected by those suggestions, for I look upon the clause as evidence of an intention to hinder and delay creditors, because such is the inevitable result of it, and we must infer “ that a man intends to do what his deliberate conduct plainly, distinctly and inevitably tends to accomplish.” It may very well be, that where the hindrance and delay is the necessary consequence of an act otherwise lawful of itself, that will not vitiate the deed, but where the intent and object is to hinder and delay, though final payment is fully intended, such intent will render void the deed. The case of Van Nest v. Yoe (1 Sand. Ch. R., 4) is a striking illustration of the principle. (See also Ward v. Trotter, 3 Monroe R., 1; Vernon v. Morton, 8 Dana R., 247.)
In all of those cases the ultimate dedication of all the debtor’s property to the payment of his debts was provided for, but in the meantime the assignment was" intended to prevent a sacrifice of it, by forced legal sales, and because of that intent the instruments were held void. And rightly so, I think, and it was well said in one of those cases: “ It is no answer to say that the debtor provides an ample fund for the payment of the debt and that the creditor is ultimately to be paid in full. The law gives to the creditor the right to determine whether his debtor shall have further indulgence or whether he will pursue his remedy for the collection of his debt.” It is this right which the clause in question would interfere with, and that interference is no *599 more lawful in one case than the other. It has always been considered objectionable for the legislature to pass laws to stop or delay parties in the collection of their debts. To allow a party to make a stop law of his own is still more obnoxious to sound principle.
I am, therefore, of opinion, that the assignment is void by reason of the clause which authorizes the assignee to sell the assigned property on- a credit, and the judgment of the superior court ought to be reversed.